Fecteau, J.
This is an action, originally in 8 counts,[1] brought by the plaintiff on account of a conveyance of real property from his decedent to the defendants, alleged to have been conditioned upon a promise by Michael Sprino that he would take Alphonse into his home and care for him for the balance of his lifetime. The plaintiff essentially seeks a rescission of the transfer of property due to an alleged repudiation of the contract. The defendants deny the existence of any contract, alleging in turn that the property was given unconditionally.
Trial was conducted before me on November 29, 2004, sitting without jury, the parties having waived their rights to jury trial. They were granted leave to file requests for findings of fact and rulings of law by December 8, 2004, at which time it was taken under advisement. Findings of fact and rulings of law follow.
*17 FINDINGS OF FACT
1. The plaintiff, Andrew Serrato (“Andrew”), resides at 70 Maple Street, Paxton, Massachusetts. He has brought suit in his capacity as executor of the estate of Alphonse Serrato (“Al”). The date of his appointment is June 4, 2001. Andrew is Al’s nephew.
2. The defendants are Michael Sprino (“Michael”), David Sprino (“David”) and Barbara Sprino (“Barbara”). Defendant, Michael Sprino, who resides at 11 Oakland Avenue, Shrewsbury, Massachusetts, is the nephew of Alphonse Serrato.
3. David F. Sprino, of 4 Clarendon Street, Worcester, Massachusetts is the son of Michael Sprino and the grandnephew of Alphonse Serrato. Barbara Sprino is married to David and, consequently is Michael’s daughter-in-law.
4. On March 8, 1999, Alphonse Serrato executed a Will naming Michael Sprino as Executor and his primary beneficiary (Exhibit “4”), a Power of Attorney naming Michael Sprino as his Attomey-in-Fact (Exhibit “3”) and a Health Care Proxy naming Michael Sprino as his proxy (Exhibit “31”).
5. The power of attorney that A1 gave to Michael included a preamble appointing Michael Sprino “to be my true, sufficient and lawful attorney-in-fact,... and for me and in my name and for my use.’’ The following powers were enumerated, among others [emphasis added):
D. To manage real property; to sell, lease, convey and mortgage realty; to foreclose mortgages and to take title to property in my name if my attorney thinks proper; to execute, acknowledge and deliver deeds of real properly, mortgages, releases, satisfactions and other instruments relating to really;
I. To do generally all acts and take all steps which in the judgment of my attorney is necessary, convenient, or expedient in the management of my property or affairs, although the matter should require more special authority which is herein contained; hereby giving my attorney full power to act for me in relation to my affairs, business, and property as fully and with like effect as I could act if personally present. . .
6. On or about December 15, 1999, Alphonse Serrato, then age 86, suffered a fall and was hospitalized at University of Massachusetts Medical Center, Worcester, Massachusetts. Prior to his fall and hospitalization Alphonse Serrato resided at 4 Clarendon Street, Worcester, Massachusetts where he lived by himself.
7. After his release from the hospital, he was admitted to the University Commons Rehabilitation Center on or about December 18, 1999 where he remained until January 12, 2000. While at University Commons, A1 became concerned about his ability to live independently. He was 86 years old and he had lost confidence after the fall. He asked his niece, Theresa Cooley, if she would come live with him, and he offered to transfer his house to her if she agreed. Ms. Cooley declined Al’s offer. Although he did not accept this rejection well, he asked if she would sell his personal property and furnishings at 4 Clarendon Street, Worcester, Massachusetts, which she did, receiving $800.00 in proceeds.
8. Thereafter, while A1 was still at University Commons, A1 approached Michael about living with him. At one time, Michael Sprino and Alphonse. Serrato lived “like brothers” in the “family home” owned by Michael’s mother and father, who had cared for and raised Alphonse Serrato. Notwithstanding their blood relationship as uncle and nephew, they were close in age: A1 was then 86 and Michael was approximately 83.
9. Al and Michael agreed that A1 would live with Michael at his home in Shrewsbury, that Michael would care for Al and A1 would transfer to Michael his house located at 4 Clarendon Street in Worcester, along with the remaining personal property in the house. Al and Michael understood that A1 was transferring his house and personal property to Michael during Al’s life because Michael agreed to take A1 in and care for him. A1 expected to live with Michael for the rest of his life, and he transferred his property to Michael in consideration of that expectation. Michael expected that A1 would live with him for as long as A1 wanted.
10. In addition to the agreement between Al and Michael, there are several references in the records of the rehabilitation center[2] indicative of a recognition expressed by A1 that he no longer thought himself capable of independent living which, in part, show:
(a) Page 2, entitled “Face Sheet,” lists next of kin as Michael Sprino;
(b) Page 6, entitled “Nurses Notes,” date and time 1/11/00: 3p-1 lp, in part states “. .. Pt. stated I am depressed,” “Discussed with patient when he goes home to see PCP (primary care physician, sic) concerning this issue. PT agreed. Pt seeking info on how to set all M.D. appt. in house. Pt encouraged when he returns home he is able to go out with family and attend things. Pt. agreed.”;
(c) Page 8, entitled “Occupational Therapy Flow Sheet,” date 12/23/99, states “I feel I have to go to a nursing home I don’t want to fall again”;
(d) Page 10, entitled “Physical Therapy," dated 1/11/00, “I’m going home tomorrow. My nephew’s daughter-in-law (sic) will be there to help me until my nephew gets out of the hospital”;
(e) Page 18, entitled “Patient Care Referral Form,” states in part, “Plan (include short and long range plans) . . . Return home with nephew Michael Sprino, 11 Oakland Avenue, Shrewsbury, MA, 853-7211; follow up services by UMass Memorial Home Health Services, 754-0050; nephew’s daughter-in- *18 law, Barbara Sprino, 5 Jones St., Worcester, MA will also provide support and transport home.”
11. Given the above references and the testimony of the parties, I infer and/or find that, while Al was at University Commons, Michael told David and Barbara about the understanding that he had reached with Al and that Al had suggested to Michael that he should give the house to his son and daughter-in-law (David and Barbara) as it would be a good “starter” house" for them. Furthermore, I infer that while Al still resided at University Commons, David and Barbara agreed to buy Al’s house from Michael, and Barbara agreed to help care for Al. This is supported in the evidence by the University Commons record of Januaiy 11, 2000 that reflects that Al’s “[flamily members intend! ] to purchase his home where he currently resides,” by Barbara’s testimony that Michael told her while Al was still at University Commons that Al had agreed to transfer his house to Michael, and by the fact that within seven days of Al moving into Michael’s house on Januaiy 12, 2000, David and Barbara had bought tools and material to begin remodeling Al’s house.
12. While Al was still at University Commons or within days of his moving into Michael’s house, Barbara and David viewed the property, decided to purchase it, and obtained a mortgage. David and Barbara agreed to pay Michael $50,400 for Al’s house. The purchase price of $50,400.00 was chosen by Michael Sprino. This price was derived by Michael Sprino’s use of the fiscal year 2000 tax bill showing an assessed valuation of the property of $74,400, dividing the amount by three for each of his children and having David and Barbara Sprino pay approximately two-thirds of the valuation amount, or $50,400 to be paid to his other two children.[3] This payment and distribution represents a gift by Michael to his three children.
13. In January 2000, David and Barbara engaged an attorney to represent them in connection with the real estate transfer. Al did not have separate, independent counsel representing his interests in the transaction. Michael told Al that the attorney hired by David and Barbara said that he could not represent him (Al) in this transaction; Al told Michael that he did not want an attorney to represent him, and repeated that to the attorney’s assistant. No one explained to or discussed with Al that proceeding with the transaction without an independent attorney or without any protection or contingency in the event that Michael decided after the closing that he was unwilling or unable to provide Al a home was a risk. Moreover, Al was not mindful, at any relevant time prior to the real estate transfer in question, of such risks.
14. In February 2000, Barbara, David, and Al signed a purchase and sale agreement. Michael initialed the agreement in three separate places. The closing of the real estate transfer occurred on April 20, 2000. A deed signed by Alphonse Serrato conveyed to the defendants David and Barbara Sprino, the property located at 4 Clarendon Street, Worcester, Massachusetts. This deed was recorded in the Worcester District Registiy of Deeds as instrument number 44635 and it appears in Book 22509, at page 125. The purchase price listed on the purchase and sales agreement, as well as the deed, was $63,000.00.1 infer that this amount was conceived by the defendants in order to actually obtain 100% financing from a mortgagee who required evidence that there was a 20% down payment from a source other than the mortgagee; consequently, the defendants obtained Al’s signature to an affidavit showing that he made a gift of equity to Barbara and David in the amount of $12,600.00.
15. On May 3, 2000, the Sprino’s attorney executed a check payable to Michael in the amount of $47,329.72. The check represented the balance of the $50,400 payment made by Barbara and David for Al’s property, after deductions for closing costs associated with the transfer. Michael Sprino offered the check to Alphonse Serrato, who refused it. By the end of May, Michael distributed $4,000 of the sale proceeds to David and Barbara and $22,500 to his other two children. He used the balance of the proceeds to buy himself an automobile. David and Barbara paid a net amount of $46,400 for Al’s property. Michael was then aware that he had used all of the proceeds of the sale of Al’s house and he was uncertain of Al’s financial condition apart from this one asset.
16. Even prior to the closing, and shortly after Al moved into Michael’s house, Michael became uncomfortable caring for Al. Michael was approximately 83 years old at the time of the transfer, suffered from heart ailments from prior to making the agreement with Al and he came to realize that it would be difficult and limiting to care for Al over the long run, and that he may not want to have Al in his home for a substantial period of time. Michael testified that shortly after Al moved into his house he realized that this was going to be and had become a significant imposition upon him and his lifestyle: He had to be home all the time, that he had to give up golfing twice a week, that he had to clean up after Al and that he had to prepare meals for Al eveiy day. Michael testified that shortly after Al moved in with him, he started losing weight because of the anxiety and tension that he experienced from Al living in his home. Prior to the closing on April 20, 2000, Michael told Barbara and David that he was uncomfortable with Al living in his home, that he was experiencing anxiety and weight loss, and that his lifestyle was being restricted by Al’s presence. At no time before the closing, however, did any of the defendants give Al any indication that Michael was having misgivings about Al living in his home.
17. Alphonse Serrato received income, directly deposited into- his bank account, from Social Security and a pension. Alphonse Serrato wrote his own checks each month, usually only one or two. Michael Sprino never wrote or signed any checks under these ac *19 counts. After moving into Michael’s home, Alphonse did not provide any financial contributions to the expenses of the household. Al was largely independent of Michael while he lived with Michael. Al was able dress, feed and bathe himself, attend to his own hygiene and go to the bathroom without help. Michael helped Al get up and down the stairs when necessary, he made Al breakfast and dinner and he ran errands for Al.
18. I find that if he had known that Michael was having misgivings about the arrangement, Al would not have authorized the transfer of his house to David and Barbara. I find further that each of the defendants knew or should have known that Al would not have authorized the transfer of his house if he had known that Michael was having misgivings about the arrangement.
19. Prior to July of 2000, Michael Sprino and Alphonse Serrato had discussions concerning Michael’s health, as did Michael, David and Barbara. Michael was also becoming increasingly anxious over the likelihood that Al may need to be placed in a nursing home, either due to his own declining health or Al’s, and how such care would be paid. Contributing to Michael’s anxiety was his uncertainty as to whether Al had any assets additional to the real estate that he had transferred to him and the proceeds from its sale which he had already disbursed to his own family.
20. On Sunday, July 23, 2000, Michael Sprino felt sick, could not reach any of his family and dropped Alphonse Serrato off at University Commons Rehabilitation Center and left him there. I do not credit Michael and David’s testimony that Michael had simply dropped Al off at University Commons temporarily while Michael sought medical care. Indeed, Michael did not go to the hospital but instead called his physician from his home. I find that Michael drove Al to University Commons in the hope that Al could remain at the facility permanently and not return to Michael’s home.
21. Having been called to the University Commons by its personnel, local police arrived and transported Alphonse Serrato back to Michael Sprino’s about one hour after he was left at University Commons. David Sprino called Michael Sprino and told him that the police were looking for him. Upon his return, Al demanded the return of his house but Michael refused. Michael Sprino and the current plaintiff Andrew Serrato then spoke about the situation, and Andrew Serrato agreed to take Alphonse to his home for a few days, as he was about to leave on a vacation. Andrew picked up Al and brought Al to his house.
22. On Monday, July 24, 2000, Andrew brought Alphonse Serrato to Elder Services where a revocation of the Durable Power of Attorney that had named Michael Sprino was executed by Al. A few days later, Andrew and Al met with other members of the Serrato family, and they agreed to try to find an assisted-living facility for Al. On Tuesday, July 25th, or Wednesday, July 26, 2000, the care of Alphonse Senato was transferred by Andrew to Rose Zingeralli, another member of the family who resided in Springfield, Massachusetts.
23. The following week, however, Al became ill and was hospitalized. Sometime in August, prior to August 16th, Al was diagnosed with pancreatic cancer. Andrew arranged for Al to consult with Attorney Katherine O’Connor who prepared, at Al’s request two documents: On August 16, 2000, Al executed a new Durable Power of Attorney naming Andrew Serrato his attorney-in-fact, and August 18, 2000, a new Will for Alphonse Serrato was executed by him in which he named Andrew Serrato and his wife, Susan, as beneficiaries. (Exhibit “18"/Will; Exhibit ”19"/Power of Attorney.) By August 18, Al had been transferred to a hospice, where he remained until he died on January 9, 2001.
24. Also in August 2000, Al brought this lawsuit, seeking to rescind the real estate transfer to David and Barbara. When Al died in January 2001, Andrew, as executor of Al’s estate, was substituted as party-plaintiff.
25. Barbara and David have lived at the 4 Clarendon Street properly from March 1,2000 through the date of the trial and continuing. They have made no payments to Al or his estate for the use of the property. Consistent with Barbara’s testimony, the fair rental value of the 4 Clarendon Street property during the period of time that Barbara and David lived in the property was at least $575 a month (which was the amount that they were paying to rent an apartment in 2000 that was smaller than the Clarendon Street propertya two-bedroom apartment vs. a three-bedroom house with a basement and a one-car garage). Even at $575.00 per month, the rental value of Al’s house since March 2000, to the date of trial is approximately $33,350.00.
26. Barbara and David expended $7,348.00 to make improvements to the Clarendon Street real estate, and they paid taxes on the property from April 2000 through the date of the trial in the amount of $7,843.43. '
27. The fair value of Al’s residing with Michael at his house from January 11, 2000 to July 23, 2000, and the care and assistance that Michael provided to him, including meals, together with the peace of mind that such an arrangement brought to Al for those six months is difficult to determine from the evidence presented. In addition, there is a value to the fact that Al’s house was occupied, rather than being left vacant, for maintenance, appearance and insurance purposes at the least. However, even if such benefits provided to Al under this arrangement are valued at a maximum of $3000.00 per month, ($1000.00 per month for room and board and $2000.00 per month for intangible personal care) which I find that they do not exceed, *20 resulting in a total value to Al of the consideration of six months with Michael of $18,000.00, they do not exceed the difference between the fair rental value of Al’s property by David and Barbara, and the expenditures made by David and Barbara. The plaintiff has expressly waived his claim to any surplus value resulting to David and Barbara from this offset.
DISCUSSION
As is often seen in litigation, events occur which are not consistent with the hopes of parties, and wise counsel will often be of assistance in planning not only for the hoped-for event but also for the untoward. Here, it was obviously within the hopes of the parties that Alphonse Serrato would live out his remaining days with Michael Sprino uneventfully. Had Al lived with Michael until he died, assuming Al had not changed his will or the power of attorney, and whether the real estate remained in Alphonse’s name (whereupon Michael would have inherited the property in question), or had Al transferred the property into Michael’s name (whereupon Michael would have become the deeded owner of the property), and the agreement being completely fulfilled between them, this case would likely not have arisen. In either case, even had Al needed nursing home care, Michael would have been authorized either under the power of attorney, or as the owner, to sell or mortgage Al’s property and pay the costs of such care from the proceeds. If the property was in Michael’s name, and he decided that he could not live up to the agreement, he could have returned the property to Al, less a reasonable fee. Neither of these scenarios played out and the arrangements that were made did not take into account any contingencies which, of course, occurred and form the basis of this litigation.
Michael agreed to allow Al to live with him and agreed to take care of him. This is alleged by the plaintiff to have been in return for Al’s property, which Michael then arranged to be transferred to David and Barbara. Michael is alleged to have reneged on his agreement with Al to allow him to live with him until he died, and Al demanded the return of his property. (As previously observed, had Michael received the property in his name, he could simply have reconveyed the property back to Al, less a reasonable charge for his caretaking services.) However, the property had instead been transferred to David and Barbara, who paid for, albeit at less than full value, and put money into the property; thereafter, Michael completely dissipated the proceeds for his own personal interest, namely, the purchase of a new car for himself and to make gifts to his children.
The plaintiff seeks rescission of the transfer by Alphonse to Michael’s son and daughter-in-law, David and Barbara, on the ground that Michael, having a fiduciary and contractual duty to protect Al and his interests, allowed the property of his client/ward to be conveyed without provision for his care, breached his trust and completely abrogated his contract with Alphonse by his having brought Alphonse to and leaving him at the nursing home on July 23, 2000.
The lynchpin issue as regards the liability of the defendants, under any theory of the case, is whether the transfer of property from Alphonse Serrato, directly to David and Barbara Sprino, but indirectly through the defendant Michael Spino, was an unconditional gift or, instead, was part of a contract or quasi-contract between Alphonse and Michael. If found to be gift, the plaintiff does not recover. If determined to be part of a contract, the issues to be decided are whether there was a breach of contract, and, if so, the proper remedy.
The case is further complicated by the fact that, on one hand, Michael, as a nephew, was within the degree of closest kinship to Al of any living relatives and was someone who Á1 had once lived with before each were married, and thus was a natural object of Al’s affection and beneficial interest. On the other hand, Michael was Al’s fiduciary under an operative power of attorney. It is true, as the defendants suggest, that family relations alone do not suffice to create a fiduciary relationship, Bruno v. Bruno, 384 Mass. 31, 33 (1981). “In general no policy of the law is contravened by conveyances or transfers of property between persons whose relations are intimate or such as to indicate a certain degree of mutual reliance. Impulses of affection and gratitude flowing from unaffected good will and grateful service are natural. If humanitarian attentions provoke the exercise of generosity, it is not obnoxious to the law.” Smith v. Smith, 222 Mass. 102, 106-07 (1915). However, as stated in Smith, supra: “(I]t often has been said that where a conveyance is made to one exclusively occupying a fiduciary relation, it is presumed to have been executed by reason of that relation and not to have been a transaction as between strangers, and the burden of proof is placed upon the grantee to prove that the transaction was fair and just to the grantor and was not procured through fraud or undue influence.” Id. at 106. “But where there is also a relationship of family or friendship, gifts or other such acts of generosity are natural and to be expected and in such a setting the presumption of impropriety is dissolved.” Markell v. Sidney B. Pfeifer Foundation, Inc., 9 Mass.App.Ct. 412, 442 (1980), quoting from Smith, supra, at 106-07.
There is no suggestion by either parly of undue influence. While the plaintiff suggests that Michael may have conmitted fraud or deceit in connection with his knowledge, at the time of the conveyance, that he did not have the intention or ability to cany through on his promise, I do not find such intent or knowledge at the time of the real estate transfer in question, notwithstanding evidence that the defendants were beginning to discuss and be anxious about Michael’s continuing ability to care for Al, especially given his own age and health. The absence of fraud, however, *21 does not diminish the fact that the road to the courthouse is paved with good intentions.
There is also no question but that Michael was Al’s attorney-in-fact at the relevant time. “It is true that the relationship between attorney and client, like those between trustee and beneficiary, director and corporation, guardian and ward, is fiduciary as a matter of law.” Smith v. Smith, 222 Mass. 102, 106 (1915). The power of attorney created a traditional principal-agent relationship between Al and Michael characterized by a duty of utmost good faith and absolute loyalty. Gagnon v. Coombs, 39 Mass.App.Ct. 144, 154 (1995) (a case that involved a power of attorney in a parent-child relationship). As Al’s attorney-in-fact, Michael stood in a fiduciary relationship to Al “with respect to all matters within the scope of the agency.” Gagnon v. Coombs, 39 Mass.App.Ct. at 154. Furthermore, the power of attorney and a health care proxy were evidence of the trust and confidence that Al had in Michael, and Michael accepted Al’s trust and confidence. Reed v. A.E. Little Co., 256 Mass. 442, 448-49 (1926) (“The duty of honest advice and full disclosure arises where one parly reposes confidence in the integrity of another and the other party voluntarily assumes and accepts the confidence”).
Obviously, the determination necessary to be made in this case would have been significantly aided had there been a writing between the parties that expressly stated the mutual promises exchanged and/or anticipated for some contingencies. However, even in the absence of such direct evidence, there is sufficient evidence in existence from which a reasonable inference can be drawn that a contract was made, even apart from Alphonse’s deposition.[4] For example, notwithstanding that Al intended to benefit Michael in his will as his residuary beneficiary, when Al was hospitalized in late 1999, into January 2000, Al first approached his niece Theresa with his proposal for her to care for him in return for his property. Only after she declined his request, at which Al became upset and gave her nothing, did he then make the request of and agreement with Michael.
Secondly, Michael stood to inherit Al’s property anyway, under his will, without any further promises on his part. I infer that Al decided to hasten the moment of transfer due to Michael’s agreement to allow Al to move into his home and take care of him. Third, upon his return from the nursing home to which Michael had driven and left him on July 23, 2000, Al immediately demanded from Michael the return of his house. I find, therefore, that Al did not intend to make a gift of his property to Michael but that it was in consideration for Michael’s promise to care for him at his house. This finding is not diminished by Michael’s attempt to give the sale proceeds to Al that he rebuffed, since he was still operating under the expectation that Michael would continue to fulfill his promise.
In connection with the fiduciary duty owed by Michael to Al, and notwithstanding that Michael did not directly execute the real estate transfer himself under the authority of the power of attorney, he failed to ensure that Al’s interests were adequately protected in the real estate transaction, since it was done without any protection or contingency in the event that Michael was no longer willing to provide room and care to Al, especially given Michael’s growing apprehension and anxiety over the arrangement. In addition, the duty was breached when Michael placed his own interests ahead of Al’s interests, by failing to set aside and preserve his assets, whether real property or sales proceeds, against the possible contingencies of Al’s need for care that Michael, as his promised caretaker, might not be willing or able to provide. Instead, contrary to his charge under the power of attorney, Michael distributed the net proceeds of the sale of Al’s house to his children after buying himself a new car.
Michael also breached his fiduciary duty of full disclosure to Al when he failed to timely disclose to Al, prior to the closing, that he may not be able or willing to care for Al for any substantial duration of time or that he had concerns about his ability to care of Al for any substantial duration of time, that there were risks to Al of going forward with the transaction without any protection or contingency in the event that Michael was no longer willing to provide room and care to Al, and he may wish to hire his own, independent counsel to represent his interests in light of those risks. As it was expressed in the case of Markell v. Sidney B. Pfeifer Foundation, Inc., 9 Mass.App.Ct. 412 (1980):
The rule [of voidability of transactions] is based on the principle that the fiduciary owes complete and undivided loyalty to the person towards whom he stands in such a relation and should not permit any other consideration to influence his actions or advice. Thus, it has been said that an attorney “who bargains with his client in a matter of advantage to himself must show, if the transaction afterwards is called in question, that it was in all respects fairly and equitably conducted; that he fully and faithfully discharged all his duties to his client, not only by refraining from any misrepresentation or concealment of any material fact, but by active diligence to see that his client was fully informed of the nature and effect of the transaction proposed and of his own rights and interests in the subject matter involved, and by seeing to it that his client either has independent advice in the matter or else receives from the attorney such advice as the latter would have been expected to give had the transaction been one between his client and a stranger.” ... Similar principles govern analogous dealings in other fiduciary contexts, as, for example, in dealings between a trustee and a beneficiaxy.
Id. at 441 [internal citations omitted).
*22 These risks were realized when Michael decided on July 23, 2000, to bring Al to the University Commons and leave him there. Whether it was a mistake or not, and no matter what else his agreement to “take care of’ him was intended to include, it was a direct breach of his agreement with Al, in its essense, to allow Al to live with him. When Michael abandoned Al at University Commons on July 23, 2000, there was a total failure of the intended continuing consideration for the April 20, 2000 deed to Barbara and David.
The plaintiff seeks to rescind the transfer as a remedy for this breach of duly/breach of contract. Rescission is a permissible remedy, but there must be an utter failure of consideration or repudiation by the party in breach. Worcester Heritage Society, Inc. v. Russell 31 Mass.App.Ct. 343, 345 (1991). “In the absence of fraud, nothing less than conduct that amounts to an abrogation of the contract, or that goes to the essence of it, or takes away its foundation, can be made a ground for rescission of it by the other party . . .” Id.., quoting from Runkle v. Barrage, 202 Mass. 89, 99 (1909). See also Barry v. Frankinl 287 Mass. 196, 199-200 (1934), and DeAngelis v. Palladino, 318 Mass. 251, 257 (1945). “Conveyances of property by aged and infirm people in consideration of promised support and maintenance are peculiar in their character and incidents, and with them the courts deal on principles not applicable to ordinary conveyances.” 12 Williston on Contracts 1456 (emphasis added). “On account of the peculiar nature of a contract to support and care for a grantor, it has been held in many jurisdictions that, upon a material breach by the grantee, the grantor is entitled to have the deed can-celled, and in other jurisdictions specific restitution has been made by compelling the grantee to transfer the property to the grantor.” Rayner v. McCabe, 319 Mass. 311, 313-14 (1946).
Thus, the inquiry turns to whether Michael’s act in bringing Al to the nursing home with an intention of leaving him there amounts to such a breach as would justify rescission of the transfer. In the case of DeAngelis v. Palladino, supra, the breach that was found to exist, namely in the failure to pay a weekly stipend, was held not sufficient to constitute an abrogation of the overall contract, as the defendant continued to abide by his promise to allow the plaintiffs decedent to live rent-free in the house that he had conveyed to the defendant, whereas in Harvey v. Crooker, 287 Mass. 279 (1929), the court found that a defendant’s failure to pay weekly support on behalf of the grantor of rights under a mortgage to collect income was a sufficient abrogation of the agreement to take care of the grantor, notwithstanding that the grantor had gone into a hospital. In the case of Vincent v. Torrey, supra, the defendants were found to have engaged in a course of conduct amounting to a “substantial failure” to reasonably “care for” the plaintiffs. In Raynor v. McCabe, supra, the court found an “entire failure of consideration” wherein the grantee, a niece of the grantor, due to the aunt’s hospitalization and death, never lived with her aunt and didn’t provide personal services as she had agreed, in return for the conveyance of property.
The case at bar offers some distinction to the cited cases, in that Michael had allowed Al to live with him for six months, which in retrospect we know was about one-half of Al’s remaining lifetime. However, the parties were in no position at that time to foretell how long Al would live, healthy or otherwise, as there were no signs visible of his impending diagnosis of pancreatic cancer that was made a month later. Moreover, it was Michael’s condition, and not Al’s, that drove Michael to act as he did. Nonetheless, Al’s reaction to Michael’s treatment of him on July 23rd, including his demand for a return of the property that day, his revocation of Michael’s power of attorney the next day, and the filing of this lawsuit on August 31, 2000, is evidence of how essential it was to Al’s agreement with Michael to be allowed to live with him and how important it was to his well-being. Thus, there was a total failure of consideration that warrants rescission.
Under Massachusetts law, a court will declare one party a constructive trustee of property for the benefit of another if he acquired the property through fraud, mistake, breach of fiduciary duty, or in other circumstances indicating that he would be unjustly enriched at the other’s expense. Kelly v. Kelly, 358 Mass. 154, 156 (1970); Fortin v. Roman Catholic Bishop of Worcester, 416 Mass. 781, 789 (1994); Nessralla. v. Peck, 403 Mass. 757 (1989). A constructive trust restores to the beneficiary that of which he has been deprived by the fiduciary’s breach of his duly. Sher v. Sandler, 325 Mass. 348, 353 (1950). “Rescission is appropriate where property has not been sold to a bona fide purchaser, and the wrongdoer still holds the property at the time of trial.” Demoulas v. Demoulas, 428 Mass. 555, 581 (1998). A“document can generally be avoided by its signer on a showing merely that the fiduciary failed to make him aware of the legal significance of the signing of the document, provided that the rights of innocent third persons have not intervened.” Markellv. Sidney B. Pfeifer Foundation, Inc., supra, at 441.
“A party claiming bona fide purchaser status bears the burden of persuasion on the issue ...” Demoulas, 428 Mass, at 575 (internal citations omitted). “Bona fide purchaser is an affirmative defense,” Demoulas, 428 Mass. 577, n.17, and generally a failure to plead an affirmative defense results in a waiver and exclusion of the defense from the case. See Anthony’s Pier Four, Inc. v. HBC Assoc., 411 Mass. 451, 471 (1991). Here defendants Barbara and David Sprino did not plead as an affirmative defense that they were bona fide purchasers, and they never notified plaintiff otherwise of their intent to rely on such a defense. Consequently, they waived the defense.
*23 Even if they had not, in proving bona fide purchaser status, the party must convince the finder of fact that he or she undertook the transaction in good faith without notice of adverse claims or knowledge of wrongful conduct. Barbara and David knew that Al agreed to transfer his real estate to them because Michael agreed to provide room and care to Al. They knew before the closing that Michael had second thoughts about the arrangement and that he may not want to take in Al for the long term. They knew that Al was not advised of Michael’s misgivings before the closing. Barbara and David knew that the transfer of the real estate was for the benefit of Michael and his children, and not Al, and that Al was receiving no money from Barbara and David for the transfer of the real estate. Barbara and David knew that Al did not have his own, independent counsel in the transaction, and that his interests were not being protected by an independent attorney or by any other independent person. Barbara and David knew that Al had named Michael in a power of attorney over Al’s financial affairs, including his property, and that Al had placed his trust and confidence in Michael. They knew or should have known that a consequence of Al being unrepresented by independent counsel in the transaction was that the P&S Agreement did not contain a contingency in the event that Michael became unable or unwilling to provide Al room and care. They knew or should have known that Michael, as a fiduciary of Al, and having agreed with Al to allow him to live with him and be taken care of, owed a responsibility to Al to act in Al’s best interest. They knew or should have realized that if Michael was going to arrange with Al to allow them to buy his house at less than market value, and use the proceeds for Michael’s own interest, instead of for Al, that this was likely wrong. Moreover, it would amount to an unjust enrichment to allow David and Barbara to purchase Al’s house for the equivalent of the 6 months care, room and board that Michael provided to Al, notwithstanding what they paid to Michael in purchase money; this clearly shows a failure of consideration by Michael in disavowing himself of the responsibility under his agreement to allow Al to live at his house and to take care of him when Michael brought Al to the University Commons on July 23rd. For all of the foregoing reasons, Barbara and David were not bona fide purchasers for value of Al’s real estate, and David and Barbara have been holding, and do hold, the real property located at 4 Clarendon Street in Worcester in a constructive trust for the benefit of the Estate.
“Equitable remedies are flexible tools to be applied with the focus on fairness and justice . . .” “Rescission is an equitable remedy, and, whenever possible, the result should be to return the parties to the status quo ante . . . Accordingly, a plaintiff seeking rescission of a contract must generally ‘restore or offer to restore all that he received under [the contract]’ . . . When complete restoration is impossible, however, the courtmay order‘whatever conditions . . . justice and equity may require,’... so long as the defendant’s rights are protected. "Ann & Hope, Inc. v. Muratore, 42 Mass.App.Ct. 223, 230 (1997); Bellefeuille v. Medeiros, 335 Mass. 262, 266 (1957) (Where “complete restoration is not possible, rescission may, nevertheless be granted upon such equitable conditions as would amply protect the rights of the defendant”). The judge may properly net out the respective benefits of the parties in arriving at a fair and equitable remedy. See Ann & Hope, Inc., 42 Mass.App.Ct. at 230-31 and n.10.
Consequently, for the foregoing joint and several reasons, namely, that there was a failure of consideration for the April 20, 2000 deed {Ex. 9) and that the deed was obtained through breach of fiduciary duty, to avoid unjust enrichment of the defendants, the April 20, 2000, deed by way of restitution must be declared cancelled and rescinded and the defendants David and Barbara Sprino must reconvey the property in question to the plaintiff.
As a condition of rescission, the plaintiff must clear the mortgage on the property, now held by Ohio Savings Bank.[5] Plaintiff need not return to David and Barbara the interest payments that they paid on the mortgage on the property, for neither Al nor his estate received mortgage proceeds, interest payments thereon, nor any benefit therefrom. Rather, the mortgage proceeds were used by Michael to make a personal purchase (of a new car) and to make gifts to his children.
A fiduciary in violation of his trust is personally liable for all losses sustained by the beneficiary though the benefit is received by a third party; “that the third party may also be liable; and that, even though the third party in the particular circumstances may not be liable, the fiduciary remains liable.” Durfee v. Durfee & Canning, 323 Mass, at 196; see Emmons v. Alvord, 177 Mass. 466, 470 (1901). Consequently, the defendant Michael Sprino must be found liable to the plaintiff in whatever amount is necessary to be paid by the plaintiff to the mortgage holder in satisfaction of the existing mortgage on the property.[6]
Within thirty (30) days of the service upon them by the plaintiff of the evidence of his payment of the existing mortgage currently held by the Ohio Savings Bank, the defendants Barbara Sprino and David Sprino shall, by suitable deed, reconvey and release the 4 Clarendon Street property to the Estate of Alphonse Serrato. In default of the delivery of such a deed to the plaintiff, a copy of the judgment in this case may be recorded by the plaintiff, pursuant to the provisions of Rule 70 of the Mass. Rules of Civil Procedure, in the Worcester County Registry *24 ofDeeds (and see Vincent v. Torrey, 15 Mass.App.Ct. at 468).
ORDER FOR JUDGMENT
For the foregoing reasons, a judgment for the plaintiff shall be entered that declares that the deed of Alphonse Serrato to the defendants David and Barbara Sprino, of the property located at 4 Clarendon Street, Worcester, Massachusetts, recorded in the Worcester District Registry of Deeds as instrument number 44635 and which appears in Book 22509, at page 125, is null and void. The judgment shall further declare that the said defendants hold the property located at 4 Clarendon Street, Worcester, Massachusetts, in constructive trust on behalf of the plaintiff.
The judgment shall further order that:
(1) the plaintiff shall pay off the mortgage on the said property which is currently held by the Ohio Savings Bank; thereafter,
(2) the plaintiff shall provide notice to the defendants of the pay-off and discharge of the mortgage; thereafter,
(3) within 30 days from their receipt of said notice, the defendants David and Barbara Sprino shall, by suitable deed, reconvey and release the 4 Clarendon Street property which had been conveyed to them by deed of Alphonse Serrato, recorded in the Worcester District Registry of Deeds as instrument number 44635 and which appears in Book 22509, at page 125, to the Estate of Alphonse Serrato. In default of the delivery of such a deed to the plaintiff, a copy of the judgment in this case may be recorded by the plaintiff, pursuant to the provisions of Rule 70 of the Mass. Rules of Civil Procedure, in the Worcester County Registry of Deeds.
(4) the defendant Michael Sprino shall pay to the plaintiff whatever amount is necessary to be paid by the plaintiff to the mortgage holder in satisfaction of the existing mortgage on the property. Within thirty (30) days of the receipt of the notice from the plaintiff of the pay-off and discharge of the mortgage, plaintiff shall submit evidence to the defendants of the amount paid to the mortgage holder, along with the discharge of the mortgage. If the defendants have any objection to plaintiffs evidence, they shall forward the objection to plaintiff within fourteen (14) days, which includes a reasonable time for mail transit. Upon receipt of defendants’ objection, or after the passage of fourteen (14) days, plaintiff shall file with the Court its evidence of the amount paid to the mortgage holder, the discharge of the mortgage and any objection received by defendants. Unless the Court considers a further hearing to be necessary, the Court shall enter final judgment against Michael Sprino in the amount paid by plaintiff to the mortgage holder to satisfy the mortgage.

The plaintiffs complaint, as amended, alleged breach of contract, deceit, unjust enrichment, breach of fiduciary duty, rescission, conversion, accounting, constructive trust and a violation of G.L.c. 231, 85J. At trial, the parties stipulated to a dismissal of the counts for conversion and for violation of chapter 231.

See medical records of Alphonse Serrato, Joint Exhibit “2" entitled ’’University Commons Medical Records."

In actuality, the value assessment for real estate taxes for a given fiscal year is made as of the January in the prior fiscal year. See G.L.c. 59, 2A. In other words, the assessed value of $74,400, for purposes of the fiscal year of2000, which is the period from July 1, 1999, to June 30, 2000, would have been made as of January 1999. The assessed value in January 2000, was $91,200. The assessed value at the time of trial, as of January 2004, was $158,000.

The defendants have objected to the admission of this deposition, as well as other statements of Alphonse made to others, as hearsay, even considering the provisions of G.L.c. 233, 65, as it does not meet the threshold requirement of good faith, since it was for purposes of litigation. I have considered such reasons, along with the rationale in the interpretative case law, such as in Shine v. Vega, 429 Mass. 456, 468-69 (1999), but given the remedial nature of the hearsay exception for the statements of deceased persons, and that had he lived it is probable that he would have been allowed to testify in largely the same manner and with the same or similar content. Moreover, since it was taken following his diagnosis of pancreatic cancer, with a very real possibility that he would not live until time of trial, it would be generally admissible as prior recorded testimony, due to his unavailability and given the opportunity for cross-examination, and so long as it meets the other rules of evidence. I overrule the objection of the defendants and allow its introduction into evidence, under the provisions of Rule 32(a)(3) of the Mass. Rules of Civil Pr. notwithstanding that the deposition was obviously for litigation purposes. His credibility suffers, however, due to significant memory loss apparent at the time of the deposition on September 7, 2000. For example, he testified that he had lived with Michael immediately prior to the July 23rd incident for eight years, rather than the six months that all other credible evidence shows.
Regarding the testimony of the other witnesses through whom conversations with Alphonse that pre-date the filing of this lawsuit were admitted, the objections are overruled.

The plaintiff agrees that this is a condition of rescission and is a requirement to which he assents.

Given the present state of the record, the uncertainty about this amount necessitates that a preliminary judgment must be entered as against Michael Sprino. The following process, similar to that under Rule 9A of the Superior Court shall be utilized in order to determine a final judgment: within thirty (30) days of the receipt of the discharge of the mortgage, plaintiff shall submit evidence to the defendants of the amount paid to the mortgage holder, along with the discharge of the mortgage. If the defendants have any objection to plaintiffs evidence, they shall forward the objection to plaintiff within fourteen (14) days, which includes a reasonable time for mail transit. Upon receipt of defendants’ objection, or after the passage of fourteen (14) days, plaintiff shall file with the Court its evidence of the amount paid to the mortgage holder, the discharge of the mortgage and any objection received by defendants. Unless the Court considers a further hearing to be necessary, the Court shall enter final judgment against Michael Sprino in the amount paid by plaintiff to the mortgage holder to satisfy the mortgage.